```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
PLAID TAKEOVER, LLC and GERALD ISAAC    :
MUSIC GROUP LLC,                        :
                                        :       23cv3014 (DLC)
                           Plaintiff,   :
                                        :         OPINION
             -v-                        :        AND ORDER
                                        :
KIM LAMONT OWENS p/k/a KEM,             :
                                        :
                           Defendant.   :
                                        :
----------------------------------------X
```

APPEARANCES:

For the plaintiff Plaid Takeover, LLC:
Hillel I. Parness
Parness Law Firm, PLLC
136 Madison Avenue, 6th Floor
New York, NY 10007

For the plaintiff Gerald Isaac Music Group LLC:
Hillel I. Parness
Parness Law Firm, PLLC
136 Madison Avenue, 6th Floor
New York, NY 10007

For the defendant Kim Lamont Owens p/k/a KEM:
Jonathan D. Davis
Anthony C. LoMonaco
Jonathan D. Davis, P.C.
1 Rockefeller Plaza, Suite 1712
New York, NY 10020

DENISE COTE, District Judge:

The plaintiffs, Plaid Takeover, LLC ("Plaid") and Gerald

Isaac Music Group LLC ("GIMG"), have brought this action against

the defendant Kim Lamont Owens p/k/a KEM ("KEM").  KEM is a

musical artist and plaintiffs' principal, Gerald Isaac

("Isaac"), managed his business from November 1, 2016 until KEM

terminated their relationship on February 24, 2023.  The

plaintiffs seek damages for amounts they contend they are owed

under the parties' contracts and for KEM's use of their

copyrighted works.  KEM has sought dismissal of some of the

plaintiffs' claims.  For the following reasons, the defendant's

partial motion to dismiss is granted in part.

## Background

The following facts are drawn from the first amended

complaint ("FAC") and documents upon which it relies.  For the

purposes of deciding this motion, the factual allegations in the

FAC are accepted as true, and all reasonable inferences are

drawn in the plaintiffs' favor.

The defendant's motion principally seeks dismissal of those

contract claims that are premised on the assertion that the

parties effectively amended the contract that governed their

relationship through an exchange of emails in September 2021.

The amendment increased a key commission rate to be earned by

Plaid from 10% to 15%.  The motion also seeks dismissal of the

copyright claims on the ground that KEM was granted a license to

use media content produced by GIMG.

I.   The Agreement

    The plaintiff Plaid is a music label that manages musical artists through its principal, Isaac.  In October 2016, Plaid and KEM entered into a contract titled "Personal Co-Management Agreement" ("Agreement").  The Agreement was for three years or one album cycle, whichever was shorter.  The Agreement included an option to extend the term for two successive periods of one year each, that is, until October 2021.  This option was to be deemed automatically exercised unless a party delivered written notice to the other party thirty days before the expiration of the current term.  KEM could terminate the Agreement at any time and for any reason.

    The Agreement provided that Plaid would receive 10% of KEM's gross income from "activities in the Entertainment Industry" as a commission, as well as 5% of KEM's gross income from "songwriting and publishing activities."  After the expiration of the term, Plaid was entitled to receive post-term commissions at specified rates for no more than five years.  In the event that KEM terminated its Agreement with Plaid before the term expired, Plaid was to be compensated through the end of the term as if the early termination had not occurred.

    Of significance to this dispute, the Agreement stated that it could not be "changed or terminated, except by an instrument

signed by the parties hereto". In addition, any amendment would become effective only when signed by all parties.

The Agreement became effective on November 1, 2016, with the original term ending on October 31, 2019. After entering into the Agreement, KEM and Plaid exercised the option to extend the term twice. This extended the length of the Agreement to five years, resulting in its expiration on October 31, 2021, and the extension of the post-term commissions to October 31, 2026.

II.  The Amendment

The FAC alleges that through a series of emails exchanged during August and September of 2021, the parties negotiated and then amended the Agreement. Among the amendments was an increase in the commission rate from 10% to 15% and an extension of the contract by three years from October 31, 2021 to October 31, 2024.

On July 14, 2021, Isaac texted KEM's attorney Denise Brown ("Brown"), asking to speak "re: Amending Management Agreement." Isaac stated that he had previously spoken to KEM and wanted to "get this out [the] of way [a]s soon as possible." On July 19, Brown sent a text message to Isaac with the first line "Kem-Gerald Isaac Commissions." This message included proposed commission terms.

On August 31, Isaac responded in an email to Brown to "circle back as it pertains to KEMISTRY and GIMG Management &

4

Services."  Isaac requested certain commission rates for several activities and proposed an additional three-year term for their contract, with the option of extending it for another two years if both parties agreed to the extension.  Isaac also proposed adding a term to provide that any termination would be for cause.

Brown responded to this email on September 3, stating that she had discussed Isaac's proposal with KEM.  Brown wrote, "[s]et forth is how [KEM] would like to proceed", and included the terms to which KEM had agreed.  Those terms included extending the Agreement for three years or the length of one album cycle.  It also included a list of commissions rates, including a 15% commission for the "2022 TOUR" and for "'One Off' Shows/Performances".  Brown indicated that KEM's right to terminate their agreement would continue to be without cause.

Isaac promptly replied, stating, "Terms gladly accepted – For clarity this is also applicable to any/all Tour(s) negotiated as well correct?"  Brown responded, "Awesome! I will get you a draft sometime next week.  I will use the existing form to make it easier."  Together, the three September 3, 2021 emails will be referred to as the September 3 Emails.

Brown did not provide Isaac with the promised draft. Isaac's email signature is included at the bottom of this email chain, and Brown's email signature is included at the bottom of

her final email on September 3.  The plaintiffs contend that with Isaac's response to the September 3 terms, the parties effectively amended the Agreement.

On September 29, KEM emailed his accountants and authorized them to make payments to Isaac described in the September 3 Emails.  Specifically, KEM asked his accountants to pay Isaac an additional 5% commission for recent shows in Cincinnati and Detroit, an additional 10% commission on a received payment, and a 15% commission on all future performances.  KEM added that the details of the "new Management Agreement" were being drawn up by Brown and would be "forwarded upon completion."

On January 4 and 17, 2022, Isaac emailed Brown about the status of the "agreed upon" terms of the management agreement. On January 19, Brown emailed a draft agreement to Isaac, stating that, "this document remains subject to Kim's review and revision until fully executed."  The draft agreement contained the terms stated in the September 3 Emails.  The draft agreement also included a clause about post-term commissions and a clause that stated it would only become effective when signed by all parties.  Neither Isaac nor KEM ever signed the January 19 draft agreement.  KEM continued to compensate Plaid at the rates agreed upon in the September 3 Emails until February 27, 2023.

### III. Termination

Throughout 2022, Isaac managed KEM's performance dates and the corresponding payments that were to be made to vendors, KEM's accountants, and KEM.  Beginning on October 5, 2021 and continuing through February 27, 2023, KEM compensated Plaid through nineteen payments at the 15% commission rate to which the parties had agreed in the September 3 Emails.

On February 24, 2023, KEM terminated Isaac's employment, thereby ending plaintiff Plaid's role as KEM's manager.  KEM made a final payment to Plaid on February 27.  Plaid calculates that it is still owed almost half a million dollars for work it performed before the termination.

### IV.  Video Wall

The FAC asserts that during the course of Plaid's tenure as KEM's manager, plaintiff GIMG developed intellectual property for KEM.  Like Plaid, GIMG operates through its principal, Isaac.  The Agreement states that "[KEM] shall own any intellectual property created by Co-Managers incorporating [KEM's] name, likeness, voice, logos or other intellectual property."

Of particular importance to this motion is a work the parties call the Video Wall.  The FAC describes the Video Wall as "Three-Dimensional Animated Story Line Content Production." KEM continued to use the Video Wall as a backdrop to his

performances following the termination of the parties
relationship.

On March 2, 2023, Isaac notified KEM of GIMG's purported
rights in the Video Wall and directed him to cease and desist
from use of the Video Wall, as well as to destroy any copies of
the Video Wall.  On March 17, GIMG's counsel sent additional
letters to KEM's counsel and other parties with the same
instructions.  GIMG holds a certificate of copyright
registration from the U.S. Copyright Office, dated March 21,
2023, for the Video Wall.

V.  Procedural History

This action was filed on April 10, 2023.  The FAC was filed
on June 16, in response to a motion to dismiss.  In the FAC,
Plaid brings claims for breach of contract, quantum meruit, and
promissory estoppel and seeks a declaratory judgment.  GIMG
brings claims for direct and vicarious copyright infringement,
unjust enrichment, and breach of license and seeks both a
declaratory judgment and injunctive relief.  The plaintiffs
attached to the FAC a series of documents, including: the
original Agreement; the September 3 Emails; text messages
between Isaac and Brown; emails between KEM, KEM's accountants,
and Isaac; KEM's letter to Isaac terminating Plaid's employment;

draft agreements for tours negotiated by Plaid; and GIMG's
certificate of copyright registration for the Video Wall.[1]

KEM filed his motion to dismiss certain claims in the FAC
on July 21.  The motion became fully submitted on August 25.

## Discussion

The defendant has brought a partial motion to dismiss the
claims in the FAC for failure to state a claim for relief.  He
principally seeks dismissal of any claims that assert that the
Agreement was amended by the September 3 Emails or that assert
plaintiff GIMG has any copyright interest in the Video Wall.
Specifically, KEM moves to dismiss in full the claims of
promissory estoppel, direct and vicarious copyright
infringement, unjust enrichment, breach of license, and
injunctive relief claims.  KEM also moves to dismiss the breach
of contract claim to the extent it seeks relief based on the
alleged amendment of the Agreement and the quantum meruit claim
to the extent it seeks relief based on a newly negotiated
percentage commission.

To survive a motion to dismiss for failure to state a
claim, the complaint "must plead enough facts to state a claim
to relief that is plausible on its face." Green v. Dep't of

---

[1] The defendant has provided a copy of the agreement that Brown
sent to Isaac on January 19, 2022, which went unsigned by both
Isaac and KEM.  This document is also integral to the FAC.

Educ. of City of New York, 16 F.4th 1070, 1076– 77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Charles v. Orange County, 925 F.3d 73, 81 (2d Cir. 2019) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "In determining if a claim is sufficiently plausible to withstand dismissal," a court "accept[s] all factual allegations as true"  and "draw[s] all reasonable inferences in favor of the plaintiffs."  Melendez v. City of New York, 16 F.4th 992, 1010 (2d Cir. 2021) (citation omitted). Nevertheless, a court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations."  Hamilton v. Westchester County, 3 F.4th 86, 91 (2d Cir. 2021) (citation omitted).  Additionally, a court may "consider extrinsic material that the complaint 'incorporate[s] by reference,' that is 'integral' to the complaint, or of which courts can take judicial notice."  Lively v. WAFRA Inv. Advisory Group, Inc., 6 F.4th 293, 305 (2d Cir. 2021) (citation omitted).

     A court sitting in diversity must apply the choice of law rules of the forum state.  Kinsey v. N.Y. Times Co., 991 F.3d 171, 176 (2d Cir. 2021).  Where the parties' briefs assume forum state law governs the case, "such implied consent is ...

sufficient to establish the applicable choice of law." Trikona
Advisers Ltd. v. Chugh, 846 F.3d 22, 31 (2d Cir. 2017) (citation
omitted).  The parties have relied upon and thereby consented to
the application of New York law in this case.[2]

I.   September 3, 2021 Amendment of Agreement

The FAC alleges that KEM has failed to pay at least
$466,000 in commissions to Plaid, in breach of the September 3,
2021 amendment to the Agreement.  The FAC plausibly pleads that
the email exchange on that date effectively amended the
Agreement.  As a result, the motion to dismiss those portions of
the FAC which rely upon that assertion is denied.

"To prevail on a breach-of-contract claim in New York, a
plaintiff must prove: (1) the existence of a contract, (2)
performance by the party seeking recovery, (3) nonperformance by
the other party, and (4) damages attributable to the breach."
Moreno-Godoy v. Kartagener, 7 F.4th 78, 85 (2d Cir. 2021)
(citation omitted).  Where there is no formally executed
agreement, and in reliance on New York law principles, the Court
of Appeals for the Second Circuit has set out a four-factor test
to determine "whether the parties intended to be bound in the

---

[2] The Agreement adopts Florida law as the law that will govern
its interpretation, application, and legal effect.  The
Agreement also selects Florida as the venue for any litigation.
KEM has not sought to enforce the forum selection clause in the
Agreement.  As noted, both parties rely on New York contract
interpretation law; no party has cited Florida law.

absence of a document executed by both sides."  Attestor Value

Master Fund v. Republic of Argentina, 940 F.3d 825, 830 (2d Cir.

2019) (citation omitted).  See Brooker Engineering, PLLC v. SK

Trust, No. 2021-01538, 2023 WL 6278506, at *2 (3d Dept. 2023).

> Under this test, a court must consider
>
> (1) whether there has been an express reservation of
> the right not to be bound in the absence of a writing;
> (2) whether there has been partial performance of the
> contract; (3) whether all of the terms of the alleged
> contract have been agreed upon; and (4) whether the
> agreement at issue is the type of contract that is
> usually committed to writing.

Attestor, 940 F.3d at 850.  Applying this test, a court may find

that an agreement exists even though it is still preliminary.

Thus, an agreement may be enforced even though the parties may

"desire a more elaborate formalization of the agreement".

Murphy v. Inst. of Int'l Education, 32 F.4th 146, 150 (2d Cir.

2022) (citation omitted).  See Art & Fashion Group Corp. v.

Cyclops Prod., Inc., 992 N.Y.S.2d 7, 10 (1st Dept. 2014).  Thus,

the "mere intention to commit the agreement to writing will not

prevent contract formation prior to execution."  Winston v.

Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1985).  Indeed,

the parties may be "fully bound to carry out the terms of the

agreement even if the formal instrument is never executed."

Vacold LLC v. Cerami, 545 F.3d 114, 124 (2d Cir. 2008) (citation

omitted).  Even where an underlying agreement contains "a

provision that it cannot be modified without a writing, a waiver

may be established by the parties' course of conduct and actual performance." McGuire v. McGuire, 153 N.Y.S.3d 280, 286 (4th Dept. 2021).

Applying this four-part test, the FAC adequately pleads that KEM and Isaac did agree to amend the Agreement on September 3, 2021, and that they effected that amendment on that date. As for the first prong of the four-part test, the Agreement provided that it "cannot be changed or terminated, except by an instrument signed by the parties hereto." The FAC adequately pleads that KEM waived enforcement of this provision when he used the September 3 rates to pay commissions to Plaid for months following September 3, 2021, and until KEM terminated the Agreement in February 2023.

The FAC also adequately pleads partial performance, including KEM's instruction to his accountants for retroactive application of the newly-agreed upon commission rate and the plaintiffs' continued management of KEM. In addition, the FAC adequately pleads that the third factor is satisfied. Since the September 3 amendment was largely addressed to new commission rates and the extension of the term of the management agreement, the FAC adequately pleads that all other essential terms of the contract can be found in the Agreement.

Finally, the FAC acknowledges that the parties agreed that KEM's attorney would provide a new contract memorializing their

September 3 agreement, but that she failed to do so for months, and only did so due to the plaintiffs' prodding.  It also acknowledges that the parties never executed that new writing. These undisputed facts do not prevent enforcement of the September 3 amendment.  See Go New York Tours, Inc. v. Tour Cent. Park Inc., 189 N.Y.S.3d 175, 176 (1st Dept. 2023).

   In support of his motion, KEM makes five arguments.  None of these arguments require dismissal of the claims which are premised on the parties having effectively amended the Agreement through their September 3 Emails.

   First, KEM argues that the purported amendment violated that Statute of Frauds and is therefore unenforceable.  As an agreement intended to be performed over at least a three-year term, there is no dispute that the amendment is governed by the Statute of Frauds and was required to be reduced to writing. See NY GEN. OBLIG. LAW § 5—701(a) (McKinney 2001).  New York courts recognize, however, that an email "sent by a party, under which the sending party's name is typed, can constitute a signed writing for the purposes of the statute of frauds." Preston v. Nichols, 189 N.Y.S.3d 837, 838 (4th Dept. 2023) (citation omitted).

   KEM next argues that the express reservation in the Agreement that prohibited the modification of the Agreement "except by an instrument signed by the partes" bars the

plaintiffs' claims based on the September 3 Emails.  But again, as already noted, New York law allows a party to waive that provision based on its course of conduct and actual performance.

KEM next emphasizes Brown's assertion in her September 3 email that she would provide a draft to Isaac "sometime next week."  KEM argues that this assertion is evidence that the parties did not intend to be bound by their email exchange until they had executed a formal contract.  In support of this argument, KEM also points to Brown's statement in January 2022, when she sent a proposed amended agreement to KEM with notice that "this document remains subject to Kim's review and revision until fully executed."  For the reasons already described, however, the FAC adequately pleads that the parties intended through their September 3 Emails to effect an amendment to the Agreement.  See Go New York Tours, Inc., 189 N.Y.S.3d at 176.

KEM also argues that key contractual terms for an amended Agreement were left undecided.  KEM lists these uncertainties as whether the new commission rates applied to all tours that had already been negotiated, the post-term commission rates, and the length of the post-term period.  These issues do not suggest that the FAC has failed to plead plausible claims based on the amendment of the Agreement.  The FAC alleges that KEM compensated Plaid at the newly negotiated rates on the already negotiated tours.  KEM's course of conduct is adequate to plead

that terms relating to Plaid's compensation had been agreed
upon.  As for the post-term period, the documents integral to
the FAC do not suggest that that issue was discussed in the
August and September 2021 emails.  Therefore, there is no reason
to dismiss the claims which are based on the amendment of the
Agreement on the ground that the parties had left critical terms
of their agreement unresolved as of September 3, 2021.

Finally, in his reply, KEM argues for the first time that
Brown did not have the authority to bind him to an amended
Agreement.  Even were it appropriate to consider this new
argument, it would not succeed in winning dismissal of the
claims premised on the amendment.  The FAC adequately pleads
that Brown had apparent authority to negotiate on behalf of KEM
and bind him to the amended Agreement.

"In the absence of actual authority, a principal may still
be bound by the actions of a person who has apparent authority."
Utopia Home Care, Inc. v. Revival Home Health Care, Inc., 109
N.Y.S.3d 467, 468 (2d Dept. 2019).  "Essential to the creation
of apparent authority are words or conduct of the principal,
communicated to a third party, that give rise to the appearance
and belief that the agent possesses authority to enter into a
transaction."  Id. at 468-69 (citation omitted).  On September
3, 2021, Brown wrote to Isaac with proposed terms to which she
represented that KEM had agreed.  The FAC alleges that twenty-

16

six days later KEM directed his accountants to pay Plaid
according to those terms.  Thus, to the extent that FAC brings
claims in reliance on its allegation that the parties
effectively amended their Agreement through the September 3
Emails, the motion to dismiss those claims is denied.

## II.  Quantum Meruit and Promissory Estoppel

KEM has also moved to dismiss the FAC's claims for recovery
under the doctrines of quantum meruit and promissory estoppel.
KEM principally argues that the September 3 Emails cannot be
used to modify the commission rates set out in the Agreement.
For the reasons just explained, that argument fails.  The FAC
plausibly pleads that the September 3, 2021 commission rates are
enforceable under these two doctrines, which are pleaded in the
alternative to the breach of contract claims.

## III. Copyright Claims

The FAC brings several claims related to GIMG's alleged
ownership of a copyright interest in works the Isaac created for
KEM and that were used by KEM and others with KEM's permission.
The parties' principal focus is on the claims related to the
Video Wall.  GIMG has obtained a copyright registration for the
Video Wall.  After addressing the motion to dismiss the Video
Wall copyright claims, the remaining claims will be discussed.

### A.  Direct and Vicarious Copyright Infringement

The FAC claims that KEM directly and vicariously infringed GIMG's exclusive rights in the Video Wall when using it in public appearances and performances.  KEM seeks dismissal of the Video Wall claims on the grounds that, at the very least, Isaac granted KEM an implied license to use the Video Wall and that any claim that Isaac was not adequately compensated pursuant to that license is subsumed within the FAC's claim for compensation to which Isaac was entitled as KEM's manager.  Plaintiffs contend that any license was revocable.  Because the FAC and documents integral to it establish that, at the very least, KEM has an irrevocable license to the Video Wall, the copyright claims are dismissed.

"To establish a claim of copyright infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Abdin v. CBS Broadcasting Inc., 971 F.3d 57, 66 (2d Cir. 2020) (citation omitted).  "To satisfy the second element, a plaintiff must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's work."  Id. (citation omitted).  Vicarious copyright infringement occurs where an individual profits "from direct infringement while declining to exercise a right to stop or

limit it." Spinelli v. Nat'l Football League, 903 F.3d 185, 197 (2d Cir. 2018) (citation omitted).

The existence of a license to use a copyright work is a complete defense to a claim of infringement. Yamashita v. Scholastic Inc., 936 F.3d 98, 104 (2d Cir. 2019). Licenses may be express or implied. ABKCO Music, Inc. v. Sagan, 50 F.4th 309, 314, 320 (2d Cir. 2022) (citation omitted). An implied license may be found where "one party created a work at the other's request and handed it over, intending that the other copy and distribute it" or where "consent may be inferred based on silence where the copyright holder knows of the use and encourages it." Id. at 320 (citation omitted). Ultimately, the existence of a license depends on whether there was "a meeting of the minds between the parties to permit the particular usage at issue." Id. (citation omitted).

A license may be revocable or irrevocable. "Consideration is necessary in order for a party to grant an irrevocable nonexclusive license", but "performance can itself constitute consideration sufficient to establish a binding contract." Small Justice LLC v. Xcentric Ventures LLC, 873 F.3d 313, 324 (1st Cir. 2017) (citation omitted). Where the allegations in a complaint are sufficient to show the existence of a license, a claim for copyright infringement may be dismissed. Yamashita, 936 F.3d at 105.

The Agreement contained several provisions relevant to the copyright claims.  They include Plaid's duty to procure "artistic material for [KEM's] exploitation as an artist" and that "[KEM] shall own any intellectual property created by Co-Managers incorporating [KEM's] name, likeness, voice, logos or other intellectual property."  Although the Agreement does not provide any express terms of compensation for KEM's use of the GIMG Assets, the FAC alleges that "GIMG would regularly incur all expenses in connection with the creation of the content, and KEM would compensate GIMG for its work, and reimburse GIMG for all of its expenses."  Additionally, the FAC alleges that, "[f]ollowing compensation for its work and reimbursement of its expenses, GIMG allowed KEM to use the content freely, without further compensation to GIMG."

The FAC alleges that GIMG created the Video Wall.  It describes the Wall as a "Three-Dimensional Animated Story Line Content Production", and alleges that KEM used it, including in his performances, from March 30, 2022 to apparently May 13, 2023, which includes a period of time after KEM terminated the management agreement on February 24, 2023.  It further alleges that Isaac and GIMG's counsel objected to the continued use of the Video Wall on March 2, 2023, and that GIMG obtained a certificate of copyright registration of the Video Wall shortly thereafter, on March 21.

For purposes of this motion, KEM has assumed that the FAC adequately pleads that GIMG has an ownership interest in the Video Wall.  It argues, however, that the FAC's allegations, together with the documents integral to the FAC, establish that KEM has at the very least an implied license to use the Video Wall.  It is correct.

Although the FAC asserts that GIMG never granted a license to KEM for use of the Video Wall, that naked assertion is insufficient to offset the other allegations that reflect the existence of, at the very least, an implied license.  These include: the Agreement's terms recited above; Isaac's creation of the Video Wall for KEM's use; KEM's use of the Video Wall during the time that Isaac was actively managing KEM; and Isaac's objection to KEM's use coming only after the termination of their management agreement.

Furthermore, the pleadings establish that the implied license granted to KEM is irrevocable.  Until Isaac's objection to KEM's use of the Video Wall, GIMG allowed KEM to use the Video Wall in exchange for the compensation KEM paid for its work for KEM and the reimbursement of its expenses.  Thus, the plaintiffs' claims of direct copyright infringement and vicarious copyright infringement do not survive.

B. Unjust Enrichment

The FAC alleges that KEM has been and continues to be enriched by his use of certain GIMG assets other than the Video Wall ("Assets").  It brings a claim for unjust enrichment based on this use.  This claim is dismissed.

The FAC identifies the GIMG Assets as: "Live Album Images"; "Kem S&S Animated Book Trailer"; "Kem Award Show Sizzle Reel"; and "Kem Visualizers, Performance Footage, 3D Animated Moving Images."  Each of these works appears to consist of photographs or audio-visual media.  This claim is dismissed as preempted by the Copyright Act.

"[T]he Copyright Act preempts state law claims asserting rights equivalent to those protected within the general scope of the statute."  Melendez v. Sirius XM Radio, Inc., 50 F.4th 294, 300 (2d Cir. 2022) (citation omitted).  Section 301 of the Copyright Act addresses the issue of preemption, stating that

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title.  Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a) (emphasis supplied).  To determine whether a state law claim is preempted by the Copyright Act, courts apply a two-part test.  Melendez, 50 F.4th at 300.  This test is separated into a subject matter prong and a general scope prong. Id. at 301.

"The subject matter requirement of the test is satisfied when the plaintiff's claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works."  Id.  When analyzing a claim under this prong, a court must look to whether the work at issue comes "within the subject matter of copyright as specified by sections 102 and 103 of the Copyright Act."  Id. (citation omitted).  Section 102 of the Copyright Act provides that copyright protection exists in original works of authorship including pictorial and graphic works, as well as motion pictures, sound recordings, and other audiovisual works.  17 U.S.C. § 102(a).

"For the general scope requirement of the test to be satisfied, the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law."  Melendez, 50 F.4th at 301 (citation omitted).  "In evaluating the application of this prong, a court looks at the right being asserted . . . and requires . . . that the right be equivalent to any of the

exclusive rights within the general scope of copyright as
specified by section 106 of the Copyright Act." Id. (citation
omitted).  Section 106 of the Copyright Act provides the
exclusive right to perform the copyrighted work publicly in the
case of audiovisual works; to display the copyrighted work
publicly in the case of pictorial or graphic works, including
the individual images of a motion picture or other audiovisual
work; and to perform the copyrighted work publicly by means of a
digital audio transmission in the case of sound recordings.  17
U.S.C. § 106.

　　When evaluating a state law claim under this test, courts
must engage in a "holistic evaluation of the nature of the
rights sought to be enforced and then make a determination
whether the state law action is qualitatively different from a
copyright infringement claim." Melendez, 50 F.4th at 302
(citation omitted).  Under the test described above, the Second
Circuit has found that claims of unjust enrichment are not
qualitatively different from a copyright infringement claim and
are preempted by the Copyright Act.  In re Jackson, 972 F.3d 25,
44 (2d Cir. 2020).

　　The FAC alleges that KEM uses the GIMG Assets for his
benefit and enrichment at GIMG's expense.  As a result, the
claim falls within § 102 of the Copyright Act and is governed by
§ 106 of the Copyright Act.  Therefore, GIMG's unjust enrichment

claim, as it pertains to the use of GIMG Assets, is preempted by the Copyright Act and fails.

C. Breach of License

The FAC pleads in the alternative a claim for breach of a license in connection with the use of the GIMG Assets.  This claim is also dismissed.  To the extent the plaintiffs seek compensation for KEM's use of the GIMG Assets, that claim must be pursued through the claims brought to enforce the Agreement and its purported amendment.

IV.  Claims for Relief

Both Plaid and GIMG seek a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, as well as injunctive relief.  KEM has moved to dismiss these claims for relief on the grounds already discussed.  To the extent these claims for relief rest on claims that have been dismissed, KEM's motion is granted.

<u>Conclusion</u>

The defendant's July 21, 2023 partial motion to dismiss is granted to the following extent.  GIMG's claims for direct and vicarious copyright infringement, unjust enrichment, and breach of license, along with related claims for a declaratory judgment and injunctive relief, are dismissed.  Plaid's breach of contract, quantum meruit, and promissory estoppel claims

survive, along with its related claim for a declaratory

judgment.


Dated:      New York, New York
            October 6, 2023

                                    _____
                                           DENISE COTE
                                    United States District Judge